Matthew Hutchison
RAMLOW & RUDBACH, PLLP
542 Central Ave.
Whitefish, MT 59937
Telephone: (406) 862-7503
Fax: (406) 862-7530
matt@ramlowrudbach.com

Attorneys for Plaintiff
Atlantic Casualty Insurance Company

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| ATLANTIC CASUALTY INSURANCE COMPANY | |
| Plaintiff, | Cause No. CV-18-76-M-DWM |
| vs. | |
| Peggy Quinn, Kevin Quinn, Brunner Homes and Construction, Inc., Wahl's Roofing, LLC, DM Drywall & Construction, Inc., and John Does 3 through 10. | **FIRST AMENDED COMPLAINT AND REQUEST FOR DECLARATORY JUDGMENT** |
| Defendants. | |

Plaintiff, Atlantic Casualty Insurance Company ("ACIC"), by and through its

counsel of record, hereby files its First Amended Complaint and Request for Declaratory

Judgment ("Amended Complaint"), pursuant to F.R.Civ.P. 15(a)(1)(B), to amend its

Complaint and to add new or substitute parties. *See, No Cost Conf., Inc. v. Windstream*

*Amended Complaint for Declaratory Judgment*                    *Page 1 of 29*

*Communs., Inc.*, 940 F. Supp. 2d 1285 (9th Cir. 2013).  The reason for the amendment is

that Defendants Peggy Quinn and Kevin Quinn ("Quinns") have amended their complaint

in their underlying lawsuit against ACIC's insured filed in the Montana Fourth Judicial

District, Missoula County, entitled *Peggy and Kevin Quinn v. Brunner Homes and*

*Construction et al,* DV 17 960 ("the Underlying Lawsuit").

      For its First Amended Complaint ACIC alleges as follows:

1.    Plaintiff Atlantic Casualty Insurance Company ("ACIC") is a corporation

      organized and existing under and by virtue of the laws of the state of North

      Carolina.  Its principal place of business is in Goldsboro, North Carolina.  As such,

      Plaintiff is a resident of North Carolina.

2.    Defendant Peggy Quinn, upon information and belief, is a resident of Missoula

      County, Montana.

3.    Defendant Kevin Quinn, upon information and belief, is a resident of Missoula

      County, Montana.

4.    Defendant Brunner Homes and Construction, Inc. ("Brunner Homes"), upon

      information and belief, is a Montana domestic corporation doing business in

      Missoula County, Montana.

5.    Defendant Wahl's Roofing, LLC, upon information and belief, is a Montana

      domestic limited liability company doing business in Missoula County, Montana,

      that is alleged to have been a Brunner Homes' subcontractor that performed work

on the construction of Quinns' new home.

6.    Defendant DM Drywall & Construction, Inc., upon information and belief, is a

Montana domestic corporation doing business in Missoula County, Montana, that

is alleged to have been a Brunner Homes' subcontractor that performed work on

the construction of Quinns' new home.

7.    Defendant John Does 3 - 10 are potential defendants who have not yet been

identified but who may ultimately have an interest herein and may be proper and/or

necessary parties to this action.

8.    Brunner Homes procured an ACIC Commercial General Liability Policy, policy

number L138005797 ("The Policy").  The Policy was effective February 7, 2015 to

February 7, 2016, the terms of which are incorporated herein by this reference and

referred to as "the Policy."[1]

9.    The Policy contains a limit of liability of $1,000,000 per occurrence.

10.   Brunner Homes, ACIC's insured, is a defendant in a lawsuit filed in the Montana

Fourth Judicial District, Missoula County, entitled *Peggy and Kevin Quinn v,*

*Brunner Homes and Construction et al,* DV 17 960 ("the Underlying Lawsuit").

The Underlying Amended Complaint is attached as Exhibit A.


JURISDICTION AND VENUE

---

[1]The Policy is incorporated by this references as though fully set forth herein.

11.     Venue is proper pursuant to 28 U.S.C. Section 1391 because the underlying

        lawsuit is venued in Missoula County, State of Montana; the insurance policy at

        issue in this declaratory judgment action was issued in the state of Montana; the

        underlying lawsuit involves real property located in Missoula County, Montana;

        the damages alleged in the underlying lawsuit occurred in Missoula County,

        Montana; and the contracts and obligations at issue in this case must be interpreted

        under Montana law.

12.     Subject matter jurisdiction is based on 28 U.S.C. Section 1332. This action

        involves a controversy between citizens of different states and the amount in

        controversy exceeds $75,000.00.

13.     Subject matter jurisdiction is alternatively based on the Declaratory Judgment Act,

        28 U.S.C. Section 2201(a).

### THE UNDERLYING LAWSUIT

14.     In the underlying lawsuit, Quinns hired Brunner Homes to construct them a custom

        home in Missoula County, Montana.  Exh. A, ¶ 7.

15.     On June 29, 2015 Quinns entered into an agreement with Brunner for the

        construction of a new home on Lot 2A Upland Trail, now 10450 Upland Trail

        according to plans purchased by Quinns.

16.     The price of the home was $745,688.98.

17.     Quinns state Brunner Homes has not completed construction and that Quinns have

not taken occupancy of the home.  Quinns have withheld payment to Brunner
Homes.

18.   On September 25, 2017, Quinns filed the Underlying Lawsuit and amended their
Complaint in May of 2017.  Quinns allege unspecified construction defects to roof,
concrete, deck, drywall, plumbing, trim, pain, windows, doors, tile, venting,
leaking and cracking.  Quinns also allege damage to a "range hood" and to other
unspecified personal property.

19.   Atlantic Casualty retained Montana law firm Spoon Gordon Ballew, PC, to defend
Brunner Homes, in the Underlying Lawsuit under a reservation of rights.

20.   Brunner Homes, through insurance defense counsel, engaged the Quinn litigation
and filed its Answer and Counterclaim in the Underlying Lawsuit on or about
November 7, 2017.  Brunner Homes answered and counterclaimed to Quinns'
Amended Complaint in the Underlying Lawsuit in June 2018.

21.   Quinns allege Brunner Homes was negligent and breached the contract in that its
work was unsatisfactory, as follows:

> Work performed on the home by Defendant Brunner was or remains
> substandard, was not performed in a workmanlike manner, and was not in
> accord with the industry's best customs and practices.  The construction
> issues include, but are not limited to: the roof, concrete, the deck, drywall,
> plumbing, trim work, paint, windows, doors, tile, venting, leaking, and
> cracking.  This has resulted in water damage, water stains, destruction of
> personal property, stained floors, damage to a range hood, and other
> damage to tangible personal property.

Exh. A, *Underlying Amended Complaint*, ¶ 12.

*Amended Complaint for Declaratory Judgment*                                    *Page 5 of 29*

The Agreement also contains a warranty that all materials, equipment, and/or labor furnished on the Project shall be "new and shall be merchantable, free of defects and fit for the particular purposes for which they have been furnished. Contractor will replace and repair at Contractor's sole expense, any such materials, equipment, appliances and/or labor which do not comply" with those warranties.

Exh. A, *Underlying Complaint*, ¶ 13.

22.    Quinns are withholding final payment on the construction agreement.

23.    Quinns claim the construction agreement required Brunner Homes to complete the work within 300 days from the commencement date under the contract.

24.    As part of their claim for damages, Quinns rely on a *per diem* penalty provision inserted into the construction contract which, according to Quinns, requires Brunner Homes to pay to Quinns a penalty of $3,728.45 per day because of the continued delay in completing the project.  *See* Exhibit A, ¶ 11.

25.    Quinns contend that, as a result of the penalty provision found in the construction contract because of non-completion, their damages have reached $2,624,828.80 as of April 27, 2018, and continue to increase by $3,728.45 every single day.

26.    This contract provision states, in pertinent part:

**Article 2.  Time of Completion.**

In the event Contractor fails to complete the Project on or before the Completion Date through no fault of Customer, Contractor shall be responsible to reimburse Customer .5% of the Contract Price per day. Customer shall have a right of set off against the Contract Price for any sums due from Contractor to Customer for failure to complete the Project on or before the Completion Date.

27.    Quinns have filed a myriad of causes of action against Brunner Homes related to

*Amended Complaint for Declaratory Judgment*                              *Page 6 of 29*

its alleged defective workmanship and failure to complete the construction of

Quinns' new home, including: (a) negligence; (b) breach of contract; (c) breach of

warranty; (d) breach of the implied covenant of good faith and fair dealing; (e)

negligent misrepresentation; (f) constructive fraud; (g) unfair and deceptive trade

practices; (h) negligent and/or intentional infliction of emotional distress; (i) unjust

enrichment; (j) residential construction defect; and, (k) negligent

retention/hiring/supervision.

28.     Most of these causes of action are, on their face, not covered under the Policy.

29.     Quinns also have not alleged that they suffered "property damage" caused by an

        "occurrence" as a result of Brunner Homes' allegedly defective workmanship.

30.     On March 15, 2018, Quinns, through counsel, demanded settlement for the

        Policy's one million dollar limits.

31.     Quinns informed that if Brunner Homes did not settle for the Atlantic Casualty

        Policy limits of One Million Dollars ($1,000,000), Quinns would do the following:

        (a) accept a consent judgment from Brunner Homes; (b) accept an assignment

        from Brunner Homes of its claims against Atlantic Casualty; and, (c) covenant not

        to execute upon Brunner Homes' assets to satisfy the consent judgment.

## COUNT I: REQUEST FOR DECLARATORY JUDGMENT.

32.     ACIC restates and re-alleges as though fully set forth herein paragraphs 1 through

        31 of this Complaint.

33.     The parties to this lawsuit dispute the extent of coverage under the Policy for the causes of action asserted by Quinns against Brunner Homes in the underlying lawsuit and ACIC's duties and obligations under the Policy.

34.     An actual controversy exists between ACIC, its insured Brunner Homes, and Quinns, regarding the extent of coverage, if any, under the Policy for these causes of action.

35.     This action seeks a declaration as to ACIC's obligations, if any, to defend and/or indemnify ACIC's insured, Brunner Homes, for the causes of action asserted against Brunner Homes by Quinns.

36.     The Policy contains the following pertinent provisions to Quinns claims:

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.  We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

> (1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and

> (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages A and B.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period;

INSURING AGREEMENT AMENDMENT - USE OF EXTRINSIC EVIDENCE - RIGHT TO DEFEND

THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A. Paragraph 1. a. of SECTION I - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY is replaced by the following:

a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and the duty to defend the insured against any "suit" seeking covered damages. We will have the right, but not the duty, to defend the insured against any "suit" for which we dispute coverage. We will have no duty to defend or indemnify the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

We may look to extrinsic evidence outside of the allegations and/or facts pleaded by any claimant to determine whether we owe a duty to defend or indemnify against a lawsuit seeking "bodily injury" or "property damage," provided that extrinsic evidence does not contradict a claimant's pleaded allegation and provided that evidence relates to a discrete coverage issue under the policy and not a merits or liability issue. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that

may result. But:

(1) The amount we will pay for damages is limited as described in SECTION Ill - LIMITS OF INSURANCE: and

(2) Our right and duty to defend a claim to which this insurance applies ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under COVERAGES A or B or medical expenses under COVERAGE C.

Paragraphs b. (3), c. and d. under Paragraph 1. Insuring Agreement of SECTION I - COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY are deleted.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under SUPPLEMENTARY PAYMENTS - COVERAGES A and B.

B.    Paragraph 1. a. of SECTION I - COVERAGES, COVERAGE B PERSONAL AND ADVERTISING INJURY is replaced by the following:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right, but not the duty, to defend the insured against any "suit" seeking covered damages. We will have no duty to defend or indemnify the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.

AGL-077 03-13

**2. Exclusions**

This insurance does not apply to:

* * *

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a

contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

> (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

> (b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

* * *

**j. Damage To Property**

"Property damage" to:

* * *

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it
and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of
which the damage arises was performed on your behalf by a
subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not
been physically injured, arising out of:

(1) A deject, deficiency, inadequacy or dangerous condition in
"your product" or "your work",· or

(2) A delay or failure by you or anyone acting on your behalf to
perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other properly
arising out of sudden and accidental physical injury to "your product"
or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or
others for the loss of use, withdrawal, recall, inspection, repair,
replacement, adjustment, removal or disposal of:

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the
market or from use by any person or organization because of a known
or suspected defect, deficiency, inadequacy or dangerous condition in

it.

* * *

## SECTION V - DEFINITIONS

* * *

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by:

> a. The repair, replacement, adjustment or removal of "your product" or "your work",· or

> b. Your fulfilling the terms of the contract or agreement.

**9.** "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business

(including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

       (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

       (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

\* \* \*

**16.** "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will he deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to he done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, hut which is otherwise complete, will he treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence al tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations/or which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

**18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage", "personal injury" or "advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to

which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

* * *

**21.** "Your product":

a. Means:

(1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a) You;

(b) Others trading under your name; or

(c) A person or organization whose business or assets you have acquired; and

(2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of" "your product"; and

(2) The providing of" or failure to provide warnings or instructions.

c. Does not include vending machines or other property rented to or located for the use of others but not sold.

22. "Your work":

a. Means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operations.

b. Includes

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

The policy has additional Exclusions/Limitations, which include the following language:

**THIS ENDORSEMENT CHANGES THE POLICY, PLEASE READ IT CAREFULLY.**

**CONDITION - INDEPENDENT CONTRACTORS AND SUBCONTRACTORS**

The classifications used in this policy containing the word "Contractors Subcontracted Work" apply to that portion of the operations performed for or on behalf of any insured by independent contractor(s) or subcontractor(s). There is no coverage for that portion of the operations performed for or on behalf of any insured by independent contractor(s) or subcontractor(s) unless Condition A or Condition B is met.

If Condition A or Condition B is not met, then this insurance does not apply to any claims, loss, costs or expense arising out of or related to the action(s) or inaction(s) of independent contractors or subcontractors by or on behalf of any insured; or for the negligent hiring, training, supervision, direction, inspection, investigation, management or retention of independent contractors or subcontractors on behalf of any insured.

Condition A.

This insurance does not apply to any claim arising from subcontracted work unless the insured can demonstrate:

1) The independent contractor or subcontractor maintains insurance in force for his operations with at least the following Limits of Liability:

A. General Aggregate Limit

(Other than Products Completed Operations) $1,000,000
Products Completed Operations Aggregate Limit $1,000,000
Each Occurrence Limit $1,000,000

B. Or the limits provided by this policy, whichever are less; and

2) A hold harmless agreement in favor of you has been executed with the independent contractor or subcontractor, for their negligence or fault, the breach or violation of a statute, ordinance, governmental regulation, standard, or rule, or the breach of contract of subcontractor, its agent or employee, or any third party under the control or supervision of the independent contractor or subcontractor; and

3) You are endorsed to the independent contractor's or subcontractors' Commercial General Liability policy as an additional insured/or the independent contractor's or subcontractors' negligence or fault, the breach or violation of a statute, ordinance, governmental regulation, standard, or rule, or the breach of contract of subcontractor, its agent or employee, or any third party under the control or supervision of the independent contractor or subcontractor; and

4) You will obtain Certificates of Insurance from each independent contractor or subcontractor with evidence verifying the requirements of paragraphs 1 and 3 above. These certificates must he kept on file for a minimum of ten years.

Condition B.

If we verify operations were performed by independent contractor(s) or subcontractor(s) and they did not meet Condition A. we will use the total cost of work performed for you by such independent contractor or subcontractor as if it were payroll to calculate the appropriate premium for the specific classification based on our rates and rules in effect as of the inception date of the policy.  It is your responsibility to pay any

additional premium due.
**AGL-130 9 13**

## CLASSIFICATION LIMITATION

This insurance does not apply to and no duty to defend is provided/or
"bodily injury," "property damage, "personal and advertising
injury" or medical payments unless the insured can demonstrate the
"bodily injury," "property damage," "personal and advertising
injury" or medical payments arise out of the classification(s) shown on
the Commercial General Liability Coverage Declarations, its
endorsements or supplements. The parties agree the definition(s) used
for the classification(s) in the policy are those defined and maintained
by the Insurance Services Office (ISO).
**AGL-015 05-14**

## CLASSIFICATION - REMODELING

This endorsement modifies insurance provided under the
following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
The Remodeling Classification shown on the General
Liability Declarations Page includes only those classes
shown in the Schedule below.

*SCHEDULE*

| CLASSIFICATION | CODE NO. |
|---|---|
| Carpentry - *NOC* | 91342 |
| *Carpentry- Interior* | 91341 |
| *Carpentry-Construction of Residential Property not exceeding three (3) stories in height* | 91340 |
| *Ceiling or Wall installation- Metal* | 91436 |
| *Door, Window or Assembled Mil/work- Installation, Metal* | 91746 |
| *Driveway, Parking Area or Sidewalk- paving or repaving* | 92215 |
| *Dry Wall or Wallboard Installation Fence* | 92338 |
| *Erection Contractor* | 94276 |
| *Floor Covering Installation- Not Ceramic, Tile or Stone* | 94569 |
| *Home Furnishings Installation* | 96053 |
| *Insulation Work - Mineral* | 96410 |
| *Insulation Work- Organic or Plastic in Solid State* | 96409 |
| *Irrigation or Drainage System Construction* | 96702 |
| *Landscape Gardening - Including Products and/or Completed Operations subject to the General Aggregate Limit.* | 97047 |
| *Janitorial Services - Including Products and/or Completed Operations subject to the General Aggregate Limit.* | 96816 |
| *Lawn Care Services - Including Products and/or Completed Operations subject to the General Aggregate Limit.* | 97050 |
| *Masonry* | 97447 |
| *Painting- Exterior -Buildings or Structures* - three (3) stories or less in height | 98304 |
| Painting- Interior-Buildings or Structures Paperhanging | 98305 |
| Plastering or Stucco Work Siding | 98344 |
| Installation | 98449 |
| Tile, Slate, Marble, Mosaic or Terrazzo Work- Interior Construction | 98967 |
| | 99746 |

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN
UNCHANGED. AGL-REM 6-15

## LIMITATION - DUTY TO DEFEND

Where there is no coverage under this policy, there is no duty to defend any insured.

Our determination regarding a defense obligation under this policy may be made on documentation, evidence, or information extrinsic to any complaint or pleading presented to us, provided such documentation, evidence or information does not contradict a pleaded allegation and provided such documentation, evidence or information relates solely to a discrete coverage issue under this policy.

For those qualifying as an additional insured by way of an additional insured endorsement, we have the right, but not the duty, to defend
**AGL-056 3113**

## AMENDED DEFINITION-PROPERTY DAMAGE

Paragraph **17 of SECTION V - DEFINITIONS** is replaced by the following:

17. "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured All such loss of use shall he deemed to occur at the time of the "occurrence" that caused ii.

However, "property damage" does not include breach of contract, breach of any express or implied warranty, deceptive trade practices or violation of any consumer protection laws.

"Property damage" does not include any cost or expense to repair,

*Amended Complaint for Declaratory Judgment*                    *Page 21 of 28*

replace or complete any work to any property that you, or any insured, are otherwise obligated to repair, replace or complete pursuant to the terms of any contract.

For the purposes of this insurance, electronic data is not tangible properly.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.
**AGL-106 03 13**


## EXCLUSION -MOLD, BACTERIA, VIRUS AND ORGANIC PATHOGEN LIABILITY

This insurance does not apply to any claim, loss, costs or expense arising from any actual or alleged:

(1) "bodily injury, " "property damage" or "personal and advertising injury;

(2) damages for devaluation of property or for the taking, use or acquisition or interference with the rights of others in property or air space; or

(3) fines, penalties and attorney fees, arising out of any governmental direction or request, or any private party or citizen action, that an insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize "organic pathogens;" or

(4) litigation or administration procedure in which any insured may be involved as a party;

arising directly, indirectly, or in concurrence or in any sequence out of actual, alleged or threatened existence, exposure to, discharge, dispersal, deposit, release or escape of' "organic pathogens," whether or not such actual, alleged or threatened existence, discharge, dispersal, release or

escape is sudden, accidental or gradual in nature.

In addition, this insurance does not apply to any alleged "bodily injury," "property damage, " "personal and advertising injury, " loss, costs or expense including but not limited to fines, penalties and attorney fees, arising out of or related to any form of "organic pathogens," whether or not such actual, alleged or threatened existence, exposure to, discharge, dispersal, deposit, release or escape is negligently or intentionally caused by any person or entity and whether or not the liability of any insured is alleged to be direct or vicarious. This exclusion also applies whether or not such injury, damage, devaluation, cost or expense is expected or intended from the standpoint of any insured

"Organic pathogen" means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, including but not limited to their byproducts such as mycotoxin, mildew, biogenic aerosol or scent.
AGL-054 313


**EXCLUSION -EXPECTED OR INTENDED**

Exclusion 2. a. of SECTION I - COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY is deleted and replaced by the following:

a. Expected Or Intended Injury

"Bodily injury" or "property damage" expected or intended from the standpoint of any insured

AGL-068- 03-13

## EXCLUSION - MENTAL INJURY

This insurance does not apply to any claim, loss, costs or expense arising out of emotional distress, mental anguish, humiliation, mental distress, mental injury, mental suffering, worry, annoyance, anxiety, inconvenience, depression, dissatisfaction, or shock to the nervous system or any physical manifestation of any of the forgoing, or any similar injury unless it arises out of physical injury that occurs to that person. AGL-073 03-13.

37.     Quinns allege they have been damaged because Brunner Homes supposedly did

        not perform its work correctly.

38.     The Policy does not apply to correct deficiencies in "your work" or "your

        product" as alleged by Quinns.

39.     Quinns' claimed damages were caused by the alleged delay or the failure by

        Brunner Homes to perform or complete the contract or agreement with Quinns

        in accordance with its terms, which is not covered by the Policy.

40.     The Policy does not apply to "bodily injury" or "property damage" for which

        the insured is obligated to pay damages due to breach of contractual obligation.

41.     The Policy does not apply to "property damage" to "impaired property" arising

        out of a delay or failure by the insured or anyone acting on the insured's behalf

        to perform a contract or agreement in accordance with its terms, as alleged by

        Quinns.

42.     Property damage covered by the Policy does not include breach of contract,

        breach of any express or implied warranty, deceptive trade practices or

        violation of any consumer protection laws.

43.     Further, the Policy does not apply to repair or replace "impaired property" that

*Amended Complaint for Declaratory Judgment*                    *Page 24 of 28*

incorporates "your work" or "your product" as alleged by Quinns.

44.     The Policy does not apply to guarantee "your work" or "your product" with

        regard to durability, timely and proper completion, quality or performance, as

        alleged by Quinns.

45.     The Policy does not apply to warranties and representations related to "your

        work."

46.     The Policy does not apply to coverage for "property damage" for cost or

        expense to repair, replace, or complete any work to any property that Brunner

        Homes is otherwise obligated to repair, replace or complete pursuant to the

        terms of any contract with any person.

47.     The Policy does not apply to claims, loss, costs or expense that result from the

        actions of any insured's subcontractor or independent contractor unless specific

        conditions are met as set forth above.

48.     The Policy does not apply to claims related to work or operations performed for

        or on behalf of Brunner Homes by any subcontractor, including but not limited

        to Wahl's Roofing, LLC or DM Drywall & Construction, Inc., as the

        Conditions in the Policy required for such coverage were not met.

49.     The Policy does not apply to the damages claimed unless they arise out of

        operations classified on the Commercial General Liability Coverage

        Declarations, its endorsements or supplements.

50.     The Policy classifies the Insured's operations as: AGL REM Remodeling,

*Amended Complaint for Declaratory Judgment*                           *Page 25 of 28*

Carpentry NOC, Contractors Subcontracted Work.

51.    The Policy was classed and rated on this basis. There is no coverage for damage arising out of operations that are not listed above.

52.    Quinns' alleged damages for emotional distress do not arise from a physical injury to Quinns and are, therefore, excluded.

53.    Quinns' alleged damages are from a loss, cost or expense incurred for the loss of use, repair, replacement, adjustment, removal or disposal of Brunner Homes' product, work, and/or impaired property because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

54.    Quinns' alleged faulty and/or defective construction of the house which caused that particular part of the property to be restored, repaired or replaced because Brunner Homes' work was incorrectly performed on it, is not covered by the Policy.

55.    Quinns' alleged damages are to impaired property or to property that was not physically injured and arose out of an alleged defect, deficiency, inadequacy or dangerous condition in Brunner Homes' product or work.

56.    Quinns' alleged damages are from "property damage" that are expected or intended from the standpoint of the Insured.

57.    The Policy does not apply to any litigation in which any insured is a party arising directly, indirectly or in concurrence or in any sequence out of actual, alleged or threatened existence, exposure to, discharge, dispersal, release or

escape of any "organic pathogen" including, but not limited to, fungus, mold and mildew.

58.     In addition, Quinns' claims are or would be excluded from coverage based on one or all of the exclusions stated above.  Other policy exclusions may apply.

59.     By reason of the foregoing, a declaratory judgment is both necessary and proper in order to set forth and determine the rights, obligations and liabilities, if any, which exist as to the Atlantic Casualty Commercial General Liability Policy, number L138005797.

WHEREFORE, Atlantic Casualty Insurance Company prays for a judgment declaring the following:

a.     That the claims in the Underlying Lawsuit are not covered or are excluded from coverage under the Policies;

b.     That Atlantic Casualty Insurance Company has no duty to defend the Insured against the claims alleged in the Underlying Lawsuit;

c.     That Atlantic Casualty Insurance Company has no duty to indemnify the Insured against the claims in the Underlying Lawsuit;

d.     That all parties shall bear their own costs and fees; and

e.     Any other relief the Court deems appropriate.

**DATED** this 18th day of July, 2018.


RAMLOW & RUDBACH, PLLP


s/*Matthew  K. Hutchison*
_____
Matthew K. Hutchison
Attorneys for Plaintiff
Atlantic Casualty Insurance Company


CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 18TH day of July, 2018, a true and correct copy of the foregoing document was filed and served via the Court's electronic filing system on the following:

| | | |
|---|---|---|
| David M. McLean | [ ] | U.S. Mail (first class postage) |
| McLEAN & ASSOCIATES, PLLC | [ ] | Federal Express |
| 3301 Great Northern Ave, Suite 203 | [ ] | Hand-Delivery |
| Missoula, MT 59808 | [ ] | Telefacsimile |
| dave@mcleanlawmt.com | [X] | Other: Court's electronic filing system |

| | | |
|---|---|---|
| P. Brad Condra | [ ] | U.S. Mail (first class postage) |
| Milodragovich, Dale & Steinbrenner, PC | [ ] | Federal Express |
| 620 High Park Way | [ ] | Hand-Delivery |
| P.O. Box 4947 | [ ] | Telefacsimile |
| Missoula, MT 59806 | [X] | Other: Court's electronic filing system |

*s/ Matthew K. Hutchison*
_____
Matthew K. Hutchison, Esq.
Attorneys for Defendant Atlantic
Casualty Insurance Company


*Amended Complaint for Declaratory Judgment*                    *Page 28 of 28*

# COPY

David M. McLean
McLEAN & ASSOCIATES, PLLC
3301 Great Northern Ave., Suite 203
Missoula, MT 59808
Telephone: (406) 541-4440
Facsimile: (406) 541-4460
dave@mcleanlawmt.com

Attorneys for Peggy and Kevin Quinn

FILED MAY 1 0 2018

SHIRLEY E. FAUST, CLERK

By_____
                        Deputy

MONTANA FOURTH JUDICIAL DISTRICT COURT, MISSOULA COUNTY

| | |
|---|---|
| PEGGY AND KEVIN QUINN,<br><br>      Plaintiffs,<br><br>v.<br><br>BRUNNER HOMES AND<br>CONSTRUCTION, INC., a Montana<br>Domestic Profit Corporation; WAHL'S<br>ROOFING, LLC; DM DRYWALL &<br>CONSTRUCTION, INC; and JOHN<br>DOE MEMBERS 1-10,<br><br>      Defendants. | Cause No. DV-17-960<br>Dept. No. 2 – Judge Deschamps<br><br><br>**FIRST AMENDED COMPLAINT<br>AND DEMAND FOR JURY TRIAL** |

        Plaintiffs Peggy and Kevin Quinn, by and through their counsel, David

McLean of McLean & Associates, PLLC, for their First Amended Complaint

against Defendants state as follows:

## PARTIES

        1.      Plaintiffs Peggy and Kevin Quinn ("Plaintiffs") are residents of

Missoula County, Montana.

        2.      Defendant Brunner Homes and Construction, Inc. ("Defendant

Brunner") is a Montana domestic profit corporation in good standing and doing

business in Missoula County, Montana.

-1-

EXHIBIT
A
tabbies'

MAY 1 4 2018

3.     Defendant Wahl's Roofing, LLC ("Defendant Wahl's") is a Montana domestic limited liability company doing business in Missoula County at all times relevant to this Complaint.

4.     Defendant DM Drywall & Construction, Inc. ("Defendant DM Drywall") is a Montana domestic profit corporation and was doing business in Missoula County at all times relevant to this Complaint.

5.     Defendants John Doe Members 1-10 are potential defendants which have not been identified but may ultimately share responsibility for liability and damages described below.

## JURISDICTION AND VENUE

6.     The events giving rise to this Complaint occurred in Missoula County, Montana. Jurisdiction and venue are therefore proper in this Court and this county, respectively.

## GENERAL ALLEGATIONS

7.     Peggy and Kevin entered into a Contractor Agreement ("Agreement") with Defendant Brunner, effective June 29, 2015. This Agreement was Defendant Brunner's contract, which he prepared, completed and provided to Peggy and Kevin. Defendant Brunner and Peggy and Kevin signed the Agreement, and it is attached and incorporated herein as Exhibit A. This Agreement was for Defendant Brunner to construct a custom home for Peggy and Kevin on Lot 2A Upland Trail, now known as 10450 Upland Trail.

8.     Pursuant to the terms of the Agreement, Defendant Brunner warranted all work would be completed "in a good and workmanlike manner in accordance with the industry's best customs and practices and in accordance with all applicable codes, rules, regulations and ordinances."

-2-

9.    The Agreement also contemplated a completion date of no later than 300 days after the commencement date.  The commencement date was set to occur within 30 days of the June 29, 2015 Agreement.

10.    Defendant Brunner was to "completely furnish all materials and labor and all Project work" was required to be completed within 300 days from the commencement date under the Agreement's terms.  Accordingly, the commencement date was no later than July 29, 2015, and a 300 day completion date would be no later than May 24, 2016.

11.    According to Defendant Brunner's Agreement, "in the event Contractor fails to complete the Project on or before the Completion date" Customer is to be reimbursed ".5% of the Contract Price per day."  The Contract Price for the home was $745,688.98, resulting in a per day reimbursement amount of $3,728.45 due to Peggy and Kevin.

12.    Work performed on the home by Defendant Brunner and subcontractors he retained was or remains substandard, was not performed in a workmanlike manner, and was not in accord with the industry's best customs and practices.  The construction issues include, but are not limited to: the roof, concrete, the decks, drywall, plumbing, framing, trim work, paint, windows, doors, tile, venting, leaking, and cracking.  This has resulted in water damage, water stains, destruction of personal property, stained floors, damage to a range hood, and other damage to tangible personal property.

13.    The Agreement also contains a warranty that all materials, equipment, and/or labor furnished on the Project shall be "new and shall be merchantable, free of defects and fit for the particular purposes for which they have been furnished.  Contractor will replace and repair, at Contractor's sole expense, any such materials, equipment, appliances and/or labor which do not comply" with those warranties.

- 3 -

14.　Peggy and Kevin provided Defendant Brunner the opportunity to cure the incomplete work, the negligent work, and the defective work on completion of the home pursuant to Mont. Code Ann. § 70-19-427. Despite representing he would inspect the home within 14 to 30 days, and despite being given multiple dates to complete an inspection, Defendant Brunner failed to inspect the home, and failed to comply with the procedures outlined in Mont. Code Ann. § 70-19-427.

15.　To date, Defendant Brunner has failed to complete construction, has failed to repair construction deficiencies caused by his work or that of those he hired to work on the home, and has failed to fulfill all obligations under the Agreement.

16.　Peggy and Kevin have not received a properly constructed new home, have not received a permanent occupancy and have appropriately withheld payment under the Agreement, although in an amount less than necessary under the Agreement from Defendant Brunner.

17.　In an effort to minimize and mitigate their damages, Peggy and Kevin have engaged other contractors to perform work on the home.

18.　Pursuant to Article 9, Defendant Brunner has an obligation to indemnify and hold Peggy and Kevin harmless, including an obligation to pay costs, expenses, and attorney's fees.

19.　During construction of the Quinn home, Defendant Brunner engaged subcontractors to perform certain services, as is custom and practice in the industry.

20.　Defendant Wahl's was a subcontractor selected by Defendant Brunner to perform work and installation of the home's roof.

21.　Defendant Wahl's failed to construct the roof competently, professionally and according to industry custom and standard.

-4-

22.     Defendant DM Drywall was a subcontractor selected by Defendant Brunner to perform dry-walling services on the home.

23.     Defendant DM Drywall failed to competently, professionally and within industry custom and standard install the drywall in the home.

24.     Defendant Brunner failed to engage contractors who would professionally, competently and within industry custom and standard perform the services for which they were engaged.

25.     Defendant Brunner failed to appropriately oversee, supervise, inspect, acquiesce or sign off on the work performed by subcontractors he selected and allowed to work on the home, and failed to ensure the subcontractor work was professionally, competently and performed within industry custom and standard.

26.     Given the inability of Defendant Brunner and his subcontractors to professionally and timely complete work, the Quinns were precluded from occupying their home as originally contemplated, resulting in a loss of use.  As the house is still not complete, this loss of use continues.

27.     As a result of Defendants' conduct and failures, in addition to damage to the home and to personal property, Peggy Quinn has also suffered physical injury and symptoms, including anxiety, shaking, loss of sleep, panic attacks, insomnia, exhaustion, stress, hot flashes, and worry.

## COUNT I – NEGLIGENCE

### (Defendant Brunner)

28.     Plaintiffs incorporate and reallege paragraphs 1-27 above as if fully set forth herein.

29.     Defendant Brunner had a duty of reasonable care to Peggy and Kevin, including the use of reasonable care in the construction of the home; reasonable care in the selection of suitable, qualified, capable and professional

1   contractors; and to ensure the new home was delivered and set up in accordance
2   with industry standards and without defects.

3        30.    Defendant Brunner breached its duty to Peggy and Kevin.

4        31.    Defendant Brunner's breach has caused Peggy and Kevin damages in
5   an amount to be proven at trial.

6                    <u>COUNT II – NEGLIGENCE</u>

7              (Defendant Wahl's and Defendant DM Drywall)

8        32.    Plaintiffs incorporate and reallege paragraphs 1-31 above as if fully
9   set forth herein.

10       33.    Defendant Wahl's had a duty of reasonable care to Peggy and Kevin,
11  including the use of reasonable care in performing service and construction on the
12  home; reasonable care in the selection of suitable, qualified, capable and
13  professional employees or independent contractors; and to ensure the work and
14  services performed was done in accordance with industry standards and without
15  defects.

16       34.    Defendant DM Drywall had a duty of reasonable care to Peggy and
17  Kevin, including the use of reasonable care in performing service and construction
18  on the home; reasonable care in the selection of suitable, qualified, capable and
19  professional employees or independent contractors; and to ensure the work and
20  services performed was done in accordance with industry standards and without
21  defects.

22       35.    Defendant Wahl's breached its duties to Peggy and Kevin resulting in
23  damage to the home and its contents as a result of the breach, including leaking
24  from the roof structure and improper ventilation.

25       36.    Defendant DM Drywall breached its duties to Peggy and Kevin
26  resulting in damage to the home as a result of that breach, including excessive
27  drywall cracking in the home.

37.    Defendant Wahl's breaches caused Peggy and Kevin damages in an amount to be proven at trial.

38.    Defendant DM Drywall's breaches caused Peggy and Kevin damages in an amount to be proven at trial.

## COUNT III – BREACH OF CONTRACT
### (Defendant Brunner)

39.    Peggy and Kevin incorporate and reallege paragraphs 1-38 above as if fully set forth herein.

40.    Peggy and Kevin entered into a contract with Defendant Brunner.

41.    The terms of that contract obligated Defendant Brunner to complete construction on the home in a good and workmanlike manner, in accordance with the industry's best customs and practices and in accordance with all applicable codes, rules, regulations and ordinances.  Defendant Brunner failed to fulfill these obligations.

42.    The Agreement required Defendant Brunner to complete construction on the home no later than 300 days after the commencement date.  Defendant Brunner failed to meet this contractual obligation.

43.    Defendant Brunner's Agreement represented that if he failed to complete the Project on or before the completion date, Peggy and Kevin would be reimbursed ".5% of the Contract Price per day."  Defendant Brunner has failed to reimburse Peggy and Kevin any of the $3,728.45 owed per day that the home remains incomplete.

44.    According to the terms of the Agreement, the home is significantly late, resulting in a payment due and owing to Peggy and Kevin in the amount of $2,624,828.80 as of April 27, 2018, with continued accrual of $3,728.45 per day thereafter.  Defendant Brunner has failed to provide any payment towards this obligation to Peggy and Kevin.

45.     Defendant Brunner has breached the terms of the Agreement in multiple ways, including but not limited to: failing perform all work in a good and workmanlike manner, failing to notify Peggy and Kevin in writing of changes occurring on the project, failing to obtain written consent for engaging subcontractors not identified in Exhibit B to the Agreement, failing to complete the project by the Completion Date and failing to provide accurate and timely invoices.

46.     As a direct result of Defendant Brunner's breach of contract, Peggy and Kevin have suffered damages in an amount to be proven at trial.

<u>COUNT IV – BREACH OF WARRANTY</u>

(All Defendants)

47.     Plaintiffs incorporate and reallege paragraphs 1-46 above as if fully set forth herein.

48.     The Agreement contains an express warranty from Defendant Brunner for all materials, equipment, appliances, and/or labor furnished on the Project, including that it be free from defects and fit for the particular purpose for which they have been furnished.

49.     Defendants have breached the implied warranty of habitability.

50.     Defendants have failed to replace or repair at their sole expense those issues not complying with applicable warranties.

51.     Peggy and Kevin relied on the Agreement's warranty when entering the contract.

52.     Defendant Brunner has breached the express warranty by not repairing the deficiencies of the new home.

53.     As a direct result of Defendant Brunner's breach of express and implied warranties, Peggy and Kevin suffered damages in an amount to be proven at trial.

54.    As a direct result of Defendants' breach of applicable warranties, Peggy and Kevin suffered damages in an amount to be proven at trial.

## COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Defendant Brunner)

55.    Peggy and Kevin incorporate and reallege paragraphs 1-54 above as if fully set forth herein.

56.    Defendant Brunner had an obligation to Peggy and Kevin to conduct itself with honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.

57.    By failing to abide by the terms of the contract, Defendant Brunner acted outside of accepted practices to deprive Peggy and Kevin of the benefit of the contract.

58.    Defendant Brunner breached the covenant of good faith and fair dealing by acting dishonestly, deceitfully, and unreasonably to deny Peggy and Kevin the benefit of the contract and to deny them their justifiable expectations that Defendant Brunner would act honestly and reasonably in the performance of the contract.

59.    Defendant Brunner's breach of the implied covenant of good faith and fair dealing has caused Peggy and Kevin damages in an amount to be proven at trial.

## COUNT VI – NEGLIGENT MISREPRESENTATION
### (Defendant Brunner)

60.    Plaintiffs incorporate and reallege paragraphs 1-59 above as if fully set forth herein.

61.    Defendant Brunner negligently made representations of material facts which were untrue regarding the quality of construction, the completion date, and repairing deficiencies.

62.    Defendant Brunner negligently made representations as to an existing material fact when stating it would repair defects on the new home and failed to do so.

63.    These representations were false and misleading at the time they were made.

64.    Defendant Brunner's representations were made without any reasonable ground for believing them to be true, and were made to induce Peggy and Kevin to enter into the contract for the newly constructed home, and Peggy and Kevin did not know the representations were false.

65.    Peggy and Kevin reasonably relied on these representations and acting as they did, and their reliance was justified.

66.    As a direct result of their reliance on Defendant Brunner's representations, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT VII – CONSTRUCTIVE FRAUD
### (Defendant Brunner)

67.    Plaintiffs incorporate and reallege paragraphs 1-66 above as if fully set forth herein.

68.    Defendant Brunner had a duty to act in good faith and deal fairly when representing it would repair defects on the new home.

69.    Defendant Brunner's representations that it would repair defects on the new home caused prejudice to Peggy and Kevin.

70.    As a result of Defendant Brunner's constructive fraud, Peggy and Kevin have suffered damages in an amount to be proven at trial.

1

## COUNT VIII – UNFAIR AND DECEPTIVE TRADE PRACTICES

2

### (All Defendants)

3    71.    Plaintiffs incorporate and reallege paragraphs 1- 70 above as if fully
4    set forth herein.

5    72.    Defendants are engaged in a trade and/or commerce with consumers
6    in the State of Montana under Mont. Code Ann. § 30-14-101 *et. seq.*, and Peggy
7    and Kevin are consumers under Mont. Code Ann. § 30-14-102.

8    73.    Defendants operate a construction and remodel business and hold
9    themselves out to the public as knowledgeable and experienced in the construction
10   and remodel of residential buildings in the State of Montana.

11   74.    While performing duties as contractors regarding Plaintiffs' new
12   home, Defendants engaged in unfair practices and/or acts in the performance of
13   their trades.

14   75.    Defendants are required to engage in fair practices and acts in the
15   performance of their trade in accordance with Montana's Consumer Protection
16   Act.

17   76.    Based on Defendants' failure to act in accordance with the Montana
18   Consumer Protection Act, as herein alleged, Peggy and Kevin are entitled to
19   damages, including treble damages, in amounts to be proven at trial.

20   77.    Based on Defendants' failure to act in accordance with the Montana
21   Consumer Protection Act, Peggy and Kevin are entitled to recover reasonable
22   attorney's fees.

23
## COUNT IX – NEGLIGENT AND/OR INTENTIONAL INFLICTION OF
24
## EMOTIONAL DISTRESS
### (All Defendants)
25

26   78.    Plaintiffs incorporate and reallege paragraphs 1-77 above as if fully
27   set forth herein.

79.   Defendants' intentional and/or negligent acts, omissions, and/or concealment, as alleged herein, caused negligent and/or intentional infliction of emotional distress.

80.   The emotional distress suffered by Peggy and Kevin was reasonably foreseeable.

81.   Plaintiffs are entitled to recover damages allowed by law for Defendants' actions and conduct.

## COUNT X – UNJUST ENRICHMENT
### (All Defendants)

82.   Plaintiffs incorporate and reallege paragraphs 1-81 above as if fully set forth herein.

83.   By their wrongful and negligent acts and omissions, as alleged herein, Defendants were unjustly enriched at the expense of and to the detriment of Peggy and Kevin, and Plaintiffs were unjustly deprived.

84.   Peggy and Kevin seek restitution from Defendants and an award of damages relating to their property, construction repairs paid by Plaintiffs which were also paid to Defendants, and damage for loss of use of their property, all in amounts to be determined at trial.

## COUNT XI – RESIDENTIAL CONSTRUCTION DEFECT
### (Defendant Brunner)

85.   Plaintiffs incorporate and reallege paragraphs 1-84 above as if fully set forth herein.

86.   Peggy and Kevin provided Defendant Brunner notice of the construction defects and requested a response within twenty-one (21) days.

87.   Defendant Brunner responded and requested dates to conduct an inspection on the home.

88.    Peggy and Kevin complied with Mont. Code Ann. § 70-19-427 and provided Defendant Brunner with multiple dates to conduct an inspection, but Defendant Brunner did not respond to the dates provided.

89.    Peggy and Kevin are entitled to the damages set forth in Mont. Code Ann. § 70-19-428.

## COUNT XII –NEGLIGENT RETENTION/HIRING/SUPERVISION

### (All Defendants)

90.    Plaintiffs incorporate and reallege paragraphs 1-89 above as if fully set forth herein.

91.    Defendants, each and all of them, owed the Quinns a duty of reasonable care when working on the home or selecting individuals or entities to work on the home, including subcontractors, contractors and employees.

92.    Defendants, each and all of them, owed the Quinns a duty of reasonable care when supervising, retaining, directing and/or hiring individuals or entities to work on the home, including subcontractors, contractors and employees.

93.    Defendants, each and all of them, breached this duty.

94.    As a result of Defendants' breaches, including the actions or inactions of their subcontractors, agents or employees; the Quinns have suffered damages in an amount to be proven at trial.

## DEMAND FOR JURY TRIAL

Plaintiffs Peggy and Kevin Quinn respectfully request a trial by jury on all issues so triable in this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    That judgment be entered in their favor;

- 13 -

2.    That the Court award Plaintiffs compensatory damages in an amount to be determined at trial;

3.    That the Court award Plaintiffs emotional distress damages in an amount to be determined at trial;

4.    That the Court award Plaintiffs damages to appropriately repair and finish the construction on the home;

5.    That the Court award damages for the physical injuries and symptoms experienced by Peggy Quinn;

6.    That the Court award damages to personal property;

7.    That the Court award damages for loss of use;

8.    That the Court award Plaintiffs treble damages as provided by statute;

9.    That the Court award Plaintiffs their reasonable attorney's fees as provided by statute and the Agreement;

10.    For costs associated with bringing this action;

11.    For indemnification from Defendant Brunner; and

12.    For such other and further relief as the Court deems just and proper.

DATED this _18th_ day of May, 2018.

McLEAN & ASSOCIATES, PLLC

BY _____
David M. McLean

Attorneys for Peggy and Kevin Quinn

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that on the _10th_ day of May, 2018, a true copy of the foregoing was mailed by first-class mail, postage prepaid, addressed as follows:

William V. Ballew
Spoon Gordon Ballew PC
PO Box 8869
Missoula, MT 59807-8869


McLEAN & ASSOCIATES, PLLC

<u>CONTRACTOR AGREEMENT</u>

**CONTRACTOR:**   Brunner Homes and Construction, Inc.

Contractor's State License # D141862

**CUSTOMER:**   Kevin and Peggy Quinn

**PROJECT:**   New Construction, Residential Home-Lot 2A Upland Trail

**EFFECTIVE DATE:** 6/29/15

THIS CONTRACTOR AGREEMENT (the "Agreement") is entered into and made effective as of Effective Date set forth above by and between the Contractor and the Customer.

<u>RECITALS</u>

A.     WHEREAS, the Contractor is knowledgeable and experienced in the construction and remodel of residential buildings and is qualified to ensure that all such construction is completed in a good and workmanlike manner;

B.     WHEREAS, the Customer desires to hire the Contractor, and the Contractor is willing to accept such hire, to render services as a general contractor and to timely provide the materials and timely perform the work necessary to complete the Project in a good and workmanlike manner in accordance with the terms and conditions of this Agreement and all applicable codes, rules, regulations and ordinances; and

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, the Contractor and Customer hereby agree as follows:

<u>AGREEMENT</u>

Article 1.   Description and Scope of Work.  The Contractor shall timely furnish all of the materials and timely perform all of the work for the Project at the Project address set forth above in accordance with the plans, drawings, schematics and bid proposal attached hereto as Exhibit "A" and incorporated herein by this reference.  The Contractor shall perform all of the work in a good and workmanlike manner in accordance with the construction industry's best customs and practices and in accordance with all applicable codes, rules, regulations and ordinances.

(a)     Quality of Materials.  Contractor shall ensure that the quality of all items and materials furnished to complete the Project shall be the best grade of such items and material available.  Contractor will not furnish or use and will not allow any sub-contractor to furnish or use any sub-standard items or materials.  The provisions of this sub-paragraph will not apply to those items and materials that Contractor shall provide pursuant to the Allowance set forth in Contractor's bid proposal attached hereto as Exhibit "A" the quality of which shall be selected by Customer subject to the Allowance.

(b)     Change Orders.  Customer may from time to time during the term of this Agreement request a work change in the character or scope of the Project.  The work change may result in an addition, deletion, deviation or modification of the materials and/or labor Contractor has agreed to

CONTRACTOR AGREEMENT                                                                 Page 1 of 7

EXHIBIT
A

provide pursuant to Exhibit "A". All such work order changes shall be in writing and signed by the Contractor and the Customer. Customer and Contractor agree that any such work change order will be charged at cost plus 12%, which is Contractor's agreed profit percentage, to the Customer and shall result in a corresponding change to the Contract Price and, if necessary, to the completion date.

(c)     Subcontractors. Contractor may engage those sub-contractors set forth on the List of Approved Sub-Contractors attached hereto as Exhibit "B" and incorporated herein by this reference. Contractor will not engage any other sub-contractor without Customer prior written consent. Any written contract or agreement between Contractor and a sub-contractor shall conform to and comply with the terms and conditions of this Agreement and this Agreement shall supercede any contract, agreement or understanding to the extent inconsistent with this Agreement. Contractor represents and warrants that every sub-contractor furnishing materials and/or labor on the Project shall be duly licensed and qualified to provide the materials and/or labor for which said sub-contractor is hired. In addition, Contractor shall not allow any sub-contractor to furnish any labor and/or materials on the Project unless such sub-contractor maintains insurance coverage of the types and amounts set forth in this Agreement.

Article 2. Time of Completion. The work to be performed under this contract shall be commenced no later than 30 calendar days following the Effective Date. The Contractor shall completely furnish all materials and labor and all Project work shall be completed no later than 300 days from commencement date (the "Completion Date"); provided, however, that the Completion Date is subject to any corresponding changes resulting from a change order. Time is of the essence of this Agreement as the Customer will vacate the premises during the completion of the Project. In the event Contractor fails to complete the Project on or before the Completion Date through no fault of Customer, Contractor shall be responsible to reimburse Customer .5% of the Contract Price per day. Customer shall have a right of set-off against the Contract Price for any sums due from Contractor to Customer for failure to complete the Project on or before the Completion Date.

Article 3. Contract Price. In consideration of all materials furnished and labor provided by the Contractor in accordance with this Agreement, the Customer will pay the Contractor a total Contract Price in a sum not to exceed the amount on the bid attached in Exhibit A ($__$745,688.98_____), which Contract Price shall be subject to corresponding adjustment, higher or lower as appropriate, for any work change orders requested by Customer.

Article 4. Progress Payments. Customer will pay the Contract Price in periodic installments as follows:

(a)     Customer will pay Contractor the sum of $15,000.00 simultaneously with the execution of this Agreement.

(b)     Customer will pay Contractor each invoiced amount on or before the 8th of every month and within 10 days of project completion.

(c)     Contractor shall provide Customer with written notice that the Project is complete and Customer will then have ten (10) calendar days following the receipt of said notice to complete an inspection of the Project and identify all punch-items. Customer shall deliver the punch-item list to Contractor and Contractor shall correct and complete all punch-list items. Customer will pay Contractor the remaining balance of the Contract Price on or before that date upon which Contractor satisfies the following conditions:

(i) Contractor must complete all work under the Project and complete and correct any and all items and issues identified on a punch-item list to be furnished by Customer to Contractor; and

(ii) Contractor must provide a construction lien release executed by each and every sub-contractor who has furnished materials and/or labor on the Project.

**Article 5.   Customer's Right to Withhold Progress Payments.**  Customer shall have the right to withhold all or any portion of any period installment payment then due and owing if:

(a)      Customer reasonably finds that any materials and/or labor furnished by Contractor or any sub-contractor is defective;

(b)      Contractor has failed to timely make prompt and proper payment to any sub-contractor;

(c)      Contractor has failed to make prompt and proper payment for any labor, materials or equipment furnished to Contractor;

(d)      Any claim or lien is filed against the property which is the subject of the Project or Customer is advised that the filing of such a claim or lien is imminent; or

(e)      Customer reasonably finds that Contractor's work is not timely progressing satisfactorily in accordance with the Agreement.

If Customer withholds a payment under this Section, Customer shall provide Contractor with an explanation of the reasons for withholding all or any portions of such progress payments.  If Contractor does not reasonably dispute the stated reason(s) for withholding payment, then Contractor shall have the opportunity to cure any such issue and receive the balance withheld.  If Contractor does reasonably dispute the stated reason(s) for withholding payment, then the parties shall utilize their best efforts to mutually resolve the dispute in a timely manner.

**Article 6.   Late Payment Penalty.**  If payment is not made when due, Contactor may suspend work on the job until such time as all payments due have been made.  If Customer fails to make an installment payment within ten (10) business days of the due date of said payment and Customer is not withholding said payment pursuant to Article 5, then such non-payment shall be deemed a material breach of this Agreement and a late payment penalty equal to five percent (5%) of said installment shall immediately become due and owing.

**Article 7.   Title and Risk of Loss.**  Title and Risk of Loss to all materials, supplies, fixtures, appliances equipment, labor, sub-contracting, operations and services provided by Contractor during the Project shall remain with and be the sole responsibility of the Contractor until Customer has paid the final installment payment of the Contract Price.

**Article 8.   Insurance.**  Contractor and each sub-contractor furnishing materials and/or labor to the Project shall purchase and maintain without interruption during the Project the following types of insurance coverage providing protection for the following liabilities and/or risks:

(a)      Commercial General Liability Insurance.  Contractor and sub-contractors shall purchase and continuously maintain a policy of liability insurance for death, injury, or disability of any human being or for damage to property arising from or related in any manner to furnishing materials and/or labor to the Project.  The limits of liability provided under such policy of commercial general liability insurance shall be an amount not less than Five Hundred Thousand Dollars ($500,000) for death or bodily injury to

any one person, One Million Dollars ($1,000,000) per occurrence for death or bodily injury to any number of persons, and Three Hundred Thousand Dollars ($300,000) for loss or damage to property belonging to any number of persons. The insurance provided under this Section is intended to provide coverage for any destruction, loss or damage to all or any portion of the Customer's personal residence which is the subject of the Project. In addition, the insurance provided under this Section is intended to provide coverage for any destruction, loss or damage to all or any portion of the Customer's personal property which Customer will store within the garage during the duration of the Project.

(b)    Workers' Compensation Insurance.  Contractor and each sub-contractor shall purchase and continuously maintain a policy of workers' compensation and employers' liability insurance as may hereafter be required under the Montana Workers' Compensation Act, Mont. Code Ann. § 39-71-101, et. seq., as may hereafter be amended from time to time. The limits of liability provided under such policy of worker's compensation insurance maintained under this Section shall be in such amounts, and with such coverages and endorsements, as may be required under the Montana Workers' Compensation Act.

Article 9.   Indemnification and Hold Harmless.  Contractor agrees to indemnify and hold Customer harmless from and against any and all claims, actions, damages, losses, injuries, demands, liabilities, costs and expenses, including attorneys fees, resulting from, arising out of or attributable in any manner to:  (i) the Project; (ii) the condition of the premises during the Project; (iii) Contractor's occupancy of the premises or furnishing of labor and/or materials on the Project; (iv) any injury or damage to any person or property while furnishing labor and/or materials to the Project, or (v) negligent acts of Contractor, Contractor's customers, clients, patrons, employees and invitees while acting on or within the Project.

Article 10  Force Majeure. The performance of both Contractor and Customer shall be excused during the period and to the extent that such performance is rendered impossible, impracticable or unduly burdensome due to acts of God, strikes, lockouts or labor difficulty; general unavailability of materials through normal supply sources; failure of any utility to supply its services for reasons beyond a party's control; explosion, sabotage, accident, riot or civil commotion; act of war; fire or other casualty; or any other cause beyond the reasonable control of the party whose performance is to be excused.

Article 11  Contractor's Representations and Warranties.  Contractor represents and warrants that:

(a)    Contractor has and will continuously maintain insurance of the type and amounts set forth in this Agreement during the duration of the Project;

(b)    Contractor will obtain all permits necessary for the work to be performed on the Project;

(c)    Contractor will remove all equipment and debris and leave the premises neat, orderly, picked-up and in broom clean condition upon completion of the Project; and

(d)    For a period of twelve (12) months following the completion of the Project, all materials, equipment, appliances and/or labor furnished on the Project shall be new and shall be merchantable, free of defects and fit for the particular purposes for which they have been furnished. Contractor will replace and repair, at Contractor's sole cost and expense, any such materials, equipment, appliances and/or labor which do not comply with the warranties set forth in this paragraph.

Article 12. Attorney's Fees and Court Costs.  If either party deems it necessary to employ an attorney or to commence legal proceedings to enforce the terms of this Agreement, the parties agree that the breaching party or unsuccessful party will pay the reasonable attorney's fees and legal costs of both

CONTRACTOR AGREEMENT                                                                  Page 4 of 7

parties, both at trial and on appeal, as the same may be approved by the court having jurisdiction over such proceedings. If the non-breaching party is required to appear in a bankruptcy, receivership, or other similar proceeding commenced by the breaching party or the breaching party's creditors, the breaching party agrees to pay the non-breaching party's reasonable attorney's fees, court costs, witness fees, and any other costs caused by the proceeding, as the same may be approved by the court having jurisdiction over such proceedings.

Article 13. Termination of Agreement. Customer may terminate this Agreement for any one or more Specified Termination Reasons (defined below) at any time by providing seven (7) days' prior written notice to Contractor. In such event, Customer shall compensate Contractor for all work completed and in place for the Project through the date of termination. "Specified Termination Reasons" means any one or more of (a) substantiated defective or delinquent performance by Contractor, (b) failure to obtain a well satisfactory to Customer in a single drill of up to 700 feet in depth, (c) any event significantly affecting the parcel on which the Project is to be built or the surrounding property or properties, including flood and forest fire, (d) the death of a Customer, and (e) the bankruptcy or insolvency of Contractor.

Article 14. Place of Performance and Venue. The place of performance of this Agreement shall be in Missoula County, Montana and venue for any civil action commenced under this Agreement shall be in the Fourth Judicial District Court, Missoula County, Montana.

Article 15. Governing Law. This Agreement shall be governed by and shall be construed in accordance with the laws of the State of Montana.

Article 16. Execution in Counterparts and Via Facsimile. This Agreement and all instruments or documents in accordance herewith may be executed in one or more counterparts or duplicates, and via facsimile, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same Agreement.

//          [THIS SPACE INTENTIONALLY LEFT BLANK]        //

[The Next Page is the Signature Page]

## Signature Page of Contractor Agreement

IN WITNESS WHEREOF, the Parties hereby execute this Agreement to be effective as of the Effective Date stated herein.

CONTRACTOR:
Brunner Homes

By:_____          DATE:___6 - 2 - 15_____
       JOSH BRUNNER, BRUNNER HOMES

CUSTOMER:

_____          DATE:___6-29-15_____
Kevin Quinn

_____          DATE:___6/29/15_____
Peggy Quinn

## LIST OF EXHIBITS

Exhibit A      Plans Purchased by Owners, built to spec with agreed changes

Exhibit B      List of Sub-Contractors and Vendors


Cabinets -- Direct Source

Windows- BMC

Lumber
Millwork
Accessories-BMC

Flooring-TBD

Electrical-Ridgeline Electric

HVAC-Mountain West Heating and Cooling

Plumbing-K&D Plumbing and Heating

Painting-JB Painting


CONTRACTOR AGREEMENT                                    Page 7 of 7